IN RE ESTATE OF G. W. BURCHAM.

No. 40611.

APRIL 10, 1931.

*Kimball, Peterson, Smith & Peterson* and *Havens & Elston,* for appellants.

*C. W. Kellogg,* for appellee.

MORLING, J.—Appellants argue no assignment of error which would affect the verdict of the jury finding the testator to have been mentally competent. For all purposes of the appeal, therefore, competency must be assumed.

Decedent died April 22, 1929, at the age of 77. He and proponent intermarried in 1902. They had no children. On January 21, 1929, testator suffered a severe stroke of paralysis, by reason of which he was confined to his bed until his death. On February 11, 1929, a priest called upon decedent, and heard him say "Get McEvoy [a banker]. I want to make a will.". Voluntarily the priest went to the bank and told McEvoy that decedent wanted to see him. McEvoy went to decedent's house, and was conducted by proponent into decedent's room. McEvoy testified that decedent said he wanted him to take care of his business for him.

"He said to Mrs. Burcham, 'I'm going to give my property to you.' I asked him who he wanted as administrator. Before I left, Mrs. Burcham suggested,—asked him—said, 'You will have me as administrator, won't you, Will, dear?' He said, 'No, I want McEvoy to be the administrator.' He said he wanted me to keep the will in my possession. * * * I asked him who he wanted as witnesses. He told me he would leave that to me. * * * After my conversation with Mr. Burcham, I went down to the bank and drew up the will as he asked me to. * * *"

The will as McEvoy drew it had written on it, at the place for signature, decedent's name, with a space between the initials and the surname for a mark, and with the word "my" above and the word "mark" below the space left. McEvoy testified:

"I gave it to Mr. Morrow [the cashier], and told him to get another witness and go up to Mr. Burcham's with the will. I have seen papers Mr. Burcham signed by mark. I never have seen any where he signed his name to it. * * * Mr. Burcham may have been able to sign his name in full. * * * He said he wanted to give his property to Callie [proponent]. He did not designate any part of it."

The cashier, P. J. Morrow, testified:

"Mr. McEvoy handed me this will, although I didn't know then what it was until he told me that it was the will of G. W.

Burcham; that he had been up there, and wanted me to get someone else who I thought would make a competent witness to the will, to go up with the will and have Mr. Burcham execute it. * * * W. T. Morrow and myself went up to the house. * * * Mrs. Burcham went with us into * * * the sick room, and I told Mr. Burcham * * * I had the will prepared by Mr. McEvoy, and I asked Mrs. Burcham and Mr. Morrow to step outside of the room, and I read the will entirely, word by word, including the witnesses' acknowledgment, * * * and asked him if that was his will, if that is what he wanted. He said: 'Yes, that is exactly the way I told Mr. McEvoy. He was here today.' Then I called Mr. Morrow into the room. I believe Mrs. Burcham came back in with him, and handed a pen to Mr. Burcham. He took it in his hand, and I said, 'Now, if you will touch the pen, I will make your mark right here,' and showed him the place. I offered the will to him to read, but he said, 'No, go ahead and read it to me.' And William T. Morrow and myself signed on both sheets of paper in his presence and at his request. * * * I don't believe I said anything to him or he to me about attempting to sign his name. I had transacted business with Mr. Burcham prior to that time. I had seen him make a mark instead of signing his name prior to that time. * * * Q. Now, then, the paper Exhibit 1, which you have referred to as the will, the mark on it there, where it says 'G. W. Burcham, my mark;' state whether or not that is the mark that was made when he was holding the pen. A. Yes, sir. * * * I said, 'I have brought Billy with me, to act as the other witness on your will.' * * * He didn't say anything. After making his mark there, he * * * said, 'Joe, take that paper to McEvoy, and tell him not to show it or give it to anyone until I call for it.' Nothing else took place there. * * * I was there in the sick room not over ten minutes. * * * Q. You called Bill Morrow and Mrs. Burcham into the sick room? A. Yes, sir. Q. And when they came into the room, you said to the decedent, the first thing, 'If you will take hold of the pen, we are ready?' A. No. * * * I said to Morrow, I said, 'Mr. Burcham has a will here that he wants witnessed; he has asked you and I to witness it.' * * * Then I turned to Mr. Burcham and said, 'If you will take the pen, we are ready.' * * * When I told him to hold the pen, and said 'We are ready,' he took hold of the pen, and I made the mark, and Bill Morrow and I signed.''

W. T. Morrow testified:

"All was said, when Joe got ready to have him sign, he said, 'Will, we are ready.' While Joe was reading the will to him, * * * Mrs. Burcham and I stepped out of the room for two or three minutes. Then I went back in. * * * Joe said, 'We are ready, Will, to sign,' he says, 'You take hold of the pen, and I will hold it.' When Joe Morrow made the mark, G. W. Burcham had hold of the pen. * * * Joe said, 'Billy is a witness and I am a witness.' When Joe said, 'Billy is a witness and I am a witness,' Mr. Burcham said, 'All right, I am glad of it.' After Mr. Burcham made his mark, he told Joe to take the papers and give them to Tom McEvoy and keep them until he called for it. * * * I heard Joe reading it to him, and Mr. Burcham said, 'Yes, that is just what I wanted.' Decedent took ahold of the pen with his right hand—top of the pen. Joe held the other part, and Joe made that mark that appears on Exhibit 1 [will]. I saw Joe make it. I have given all of the conversation that took place there from the time I entered until I left, in the order in which it transpired; and that is all that was said, as near as I can remember."

A nurse testified that decedent told her one evening "that he had made his will, and that he had left everything to his wife. He called her 'Callie,' by name, and he wanted her to have everything, he said. I remember of him telling me that they had lived on a farm for many years,—for several years,—and that his wife worked with him to earn what they had. He told me that more than once."

This evidence is without dispute.

I. Appellants argue that the will was not signed by the testator. As has been stated, the jury has found that testator was mentally competent, a finding that is unaffected by any  ruling of which complaint is made. He understood that he had had his will drawn, that he was to sign it, that he was in the habit of signing by mark, that he was in the act of thus signing the will. He knew and intended that his mark was being affixed to the instrument as evidencing his own intended physical execution of it, by means of his holding the pen and Morrow's directing the necessary movement of the pen at the proper place.

The court properly held, as matter of law, that testator did sign the instrument. *Scott v. Hawk,* 107 Iowa 723.

II. Appellants argue that the witnesses to the will must have become such upon the request of the testator. The will was read to testator, and the witnesses' acknowledgment was read to  him. He said that was just the way he wanted it. He intended that it should be executed. He was told that the two men present were witnesses. He said "All right. I am glad of it." There can be no doubt that the witnessing was with testator's full knowledge, intent, and approval; and that is all that is necessary. See *Hull v. Hull,* 117 Iowa 738.

III. Appellants contend that the issue of fraud should have been submitted to the jury. The argument, as we understand it, is that the signing of the will was the act of P. J. Morrow, and that decedent's physical and mental condition was such that he could not resist P. J. Morrow's direction to take hold of the pen while the mark was being made. There can be no doubt that the testator intentionally, on his own volition, without fraud or even persuasion, signed the instrument disposing of his property according to his own voluntary instructions. There was no evidence of fraud or basis for finding fraud.

IV. The court instructed fully as to what must be found from the evidence in determining the issues. In one instruction the court told the jury that by the terms "preponderance" and "greater weight of the evidence" was not necessarily meant the greater number of witnesses, but "the convincing character of the testimony, that testimony which is the more reasonable, satisfactory, and convincing," etc. Appellants urge that the court should have used the word "evidence," instead of "testimony;" that "evidence" is a broader term than "testimony;" that the will "is evidence, but does not constitute testimony;" that by the instruction, therefore, the jury was unduly restricted in weighing the evidence.

In strict legal parlance, the word "testimony" applies more particularly, as appellants argue, to the declarations of the witnesses made orally in court or by deposition. Testimony is a species, evidence the genus. Popularly, however, the words are used in the same sense. See *Miller v. Wolf,* 63 Iowa 233.

The jury was not misled, and there was no prejudice. There is no error.—*Affirmed.*

FAVILLE, C. J., and EVANS, STEVENS, ALBERT, KINDIG, WAGNER, and GRIMM, JJ., concur.