Eugenia H. Talbott, Appellee, v. Independent School District of Des Moines et al., Appellants.

No. 45629.

AUGUST 4, 1941.

Strock, Woods & Dyer, for appellee.

Hutchinson & Hutchinson and ·Herrick, Sloan & Langdon, for appellants.

BLISS, J.—The statutory provisions involved in this action were enacted in 1917 by the 37th General Assembly, chapter 387 of its laws, and appear as sections 4345, 4346 and 4347. The first of these sections provided that any independent school district having a population of seventy-five thousand or more might establish a pension and annuity system for the public school teachers of the district. The other two sections are as follows:

"4346. Fund. The fund for such retirement system shall be created by an annual tax not exceeding two-tenths of a mill on the dollar, by an assessment of the teachers not exceeding one per cent of their salaries in any one year, and by the interest on any permanent fund which may be created by gift, bequest, or otherwise.

"4347. Management. The board of directors of the independent school district shall constitute the board of trustees and shall formulate the plan of the retirement; and shall make all

necessary rules and regulations for the operation of said retirement system.''

By amendment, section 4345 has been broadened to include other independent districts. (Chapter 110, 43d General Assembly.) Section 4346 was amended by the 45th General Assembly, chapter 121, section 14, by striking out ''two-tenths'' and substituting ''one-twentieth''. This section as amended was repealed by the 46th General Assembly, chapter 40, approved April 29, 1935, and effective by publication May 2, 1935, and re-enacted by the same act in the form as it appears in the Codes of 1935 and 1939. As there provided, the assessment against the teachers may be increased by the board, with the consent of a majority of the teachers, and the annual tax levy may be increased up to the amount raised by the assessment against the teachers. These amendments are of no materiality except as they broaden the perspective of the matter for determination.

On April 22, 1918 the defendant Board, pursuant to said enabling statute, by Rule XIX-A, effective in September following, established a pension and retirement system for the teachers of the district. Such sections of the Rule or parts of sections as are material, are as follows:

''Section II. Amount of Pension. Any teacher who has completed 30 or more years of service not less than fifteen years of which shall have been in the public schools of Des Moines and shall have attained the age of fifty-five years and who shall have complied with Section V hereof, may retire upon an annual annuity of $480.00 payable quarterly * * *.

''Section III. Retirement for Disability. Any teacher having twenty years of service, ten of which shall have been in the public schools of Des Moines may be retired for such physical or mental disability as disqualifies her from continuing successfully in the work of teaching upon such proportion of $480.00 as her age shall bear to 55, the $200.00 contribution to the Permanent fund to be made as in Section V. Proof of disability shall be by affidavit of two physicians appointed by the Board and such other evidence as the Board may require.

''Section V. Total Payment to Funds Required. Each teacher must pay into the Current fund hereinafter defined

$200.00 before she can take advantage of the pension benefits.
* * *

"Section VIII. Current Fund—How Created and Used. The Current fund shall be used for the payment of annuities and expenses. It shall be created as follows:

"a. By the amount raised by a .2 mill tax, levied annually on all the taxable property in the school district.

"b. By the amount raised by retaining annually one per cent of the salaries of the teachers of this district. * * *

"Section XI. Not Transferable nor Subject to Execution. No teacher shall have any vested interest in or to the funds created hereby or any portion thereof and the same may not be sold, assigned or aliened but the said funds shall be held in trust by the Board of Directors solely for the support of retired teachers. No heirs, legatees, creditors, or assignees shall be entitled to any portion of the said teacher retirement fund hereby created and the interest of any teachers therein may not be subject to garnishment or execution. In case of attempt to sell, assign, or transfer the right to a pension hereunder, the board reserves the right to cancel any or all further payments thereof.

"Section XII. Revision. The Board reserves the right to modify these rules or any of them as may be necessary from time to time."

The plaintiff was born May 29, 1876, although her birth date appeared in the records of the defendant as May 29, 1885. There is no question that she has taught more than the 30 years necessary for retirement, and that 29 of these years were in the defendant school district. After teaching 2 years in Clarke County, Iowa, she came to Des Moines in 1906 and began teaching in the schools of the defendant in September of that year. From that time she taught continuously in those schools until the 5th day of June, 1935. During the last few years her work was not satisfactory to her superiors. Prior to the execution of her last contract on May 21, 1934, she was told by the superintendent that unless her work was satisfactory during the coming year, she would not be re-hired. At that time she was eligible to retire under Rule XIX-A. She had taught 31 years, as above set out. She was more than 55, and almost 58, years old. Assessments had been deducted from her pay in excess of $200,

as provided in section V of the Rule. She did not desire to retire but wished to continue teaching. She was told by her superiors before the close of the 1934-1935 school year that she would not be re-hired. That year ended on June 5, 1935. She was not re-employed by the defendant school and has done no teaching since that date. In her record as a teacher, kept by the defendants, is the following entry: "Dropped June 7, 1935." She importuned the superintendent and members of the Board repeatedly to be permitted to continue teaching but was told definitely that she was through teaching in the Des Moines schools.

In the minutes of the Board of September 17, 1935, it appears that a committee of the Board made the following report:

"Persons for whom leaves of absence are requested:

| "Name | Length of time | Reason |
|---|---|---|
| "Eugenia Talbott | School year 1935-36 | Illness." |

It is conceded by defendants that this leave of absence was not requested by plaintiff and was granted without her knowledge. So far as the record shows, her first knowledge of it came to her in a letter written to her by the acting superintendent under date of June 4, 1936. Subsequent leaves of absence were granted her by the Board covering the years 1936, 1937 and 1938. They were all without her request. They were granted by the Board with the kindest of intentions and for the purpose of protecting and preserving her pension and retirement rights, under the new rules for the retirement system, adopted March 6, 1936. Section V of these rules provided that any member who shall have reached the age of 60 years *"and shall be in active service or on leave of absence* shall be retired." Section VI had a similar provision for retirement for disability.

From 1936 on, the superintendent and some of the Board members were urging her to apply for disability pension under Section III of Rule XIX-A, or under Section VI of the new rules. This was because their records showed she was not old enough to get a retirement pension. The plaintiff insisted that she was not ill or under any disability, and continued to ask that she be re-employed, until in the summer or fall of 1938.

It appears that in 1914, those in charge of the defendant school gave to each teacher a printed, five by eight inch card, with blanks on each side, with instructions that the data specified, with respect to school preparation, and schools taught, be filled out. At the top of the card beneath the printing "Date of Birth" appears the written figures "1885 year 5 Mo. 29 Da." The plaintiff testified that while she had no recollection of filling out the card, she thought most of the writing was hers, but that the written figures stating the date of her birth were not correct and were not placed on the card by her, and that she never saw the figures on the card until in the summer of 1940. The data after 1914 is in a different handwriting from the data before 1914. While the trial court made no specific finding that she did not make the figures as to her age, such a finding may be implied from the judgment adverse to defendants. This case is not triable de novo on appeal and we are bound by the finding of the trial court. There is no testimony disputing that of the plaintiff, and the card, which has been certified to us, does not appear to refute her testimony. In our view of the case, the fact that her age appears incorrectly on the card is of little materiality. Plaintiff testified that she first learned that her age was incorrectly noted on the card, from a letter which the superintendent or a member of the Board wrote to a lawyer who was interceding for her as a friend. She then procured the family Bible and with that and other proof satisfied the President of the Board and the superintendent that she was born on May 29, 1876. Thereafter there was some further talk about her applying for a disability allowance. On December 10, 1938, the superintendent wrote her to come to his office to work out something with regard to retirement for service, "at a date thirty days after the signing of the application, or for disability at some previous date." She met with him on December 14, 1938, and he asked her to sign an application for retirement for service with payments to commence at that time. She had been insisting that the pension be paid from June 5, 1935, and refused to sign the application. She testified that the President of the Board told her the Board was going to allow her a pension from June 5, 1935. The President denied this. At a meeting of the Board on December 20, 1938, the superintendent pre-

sented to the Board an application, signed by himself, setting out all facts showing her eligibility for a retirement pension, and asking that such a pension be granted from December 20, 1938. The application was granted and monthly checks of $40 each were thereafter sent to plaintiff but she refused to cash them. On January 25, 1940 the plaintiff made written application for a pension for the period commencing on June 5, 1935 and ending on December 20, 1938. This is the first application made by plaintiff for a pension. The application was denied on March 5, 1940. At the same time the Board rescinded its action of December 20, 1938 granting plaintiff a pension from that day on, stopped payment on all warrants issued to plaintiff for pensions, and directed the secretary to demand the return of those warrants. It may be said, however, that counsel have stated in both oral and written argument that this case involves no controversy over any pension payments subsequent to December 20, 1938, and that these payments are being made and will continue to be made during the life of plaintiff.

The cases show that the predominant cause of the large amount of litigation having to do with public employees' pension or retirement systems is because the legislation establishing them uniformly promises much more than can be accomplished. The taxes and other public moneys and the contributions of the employees designed to maintain the retirement fund seldom build up sufficient reserves to pay the disability or service retirement allowances during the life expectancies. The systems are seldom actuarially sound. It is usually several years before.this is fully realized. And when attempts are then made to strengthen the plan and to put it on a sounder financial basis either by increasing the contributions, raising the retirement age, or decreasing the allowances, the beneficiaries feel that their rights, present or prospective, are being impaired, when in fact what they think they have lost or will lose, is something impossible to obtain under the plan. And so it was with the plan of the defendants. It was not sound. For a period the tax had been reduced. The fund was being depleted. The retirement allowances were being prorated. The Board in order to strengthen the system financially and lessen the cost of maintenance, by resolution, on April 16, 1935, raised the retirement age from

55 years to 65 years, and on March 6, 1936 a new plan was adopted reducing the retirement age from 65 years to 60 years. It may be said that pension systems for public employees are being widely extended. Teachers' retirement acts have been passed in perhaps half of the states with a serious attempt to make them actuarially sound by assessing the teachers 4, or 5 percent of the payroll with the governing body contributing a like amount, and permitting any teacher who quits teaching to withdraw from the fund the contributions made with accumulations. Under the Des Moines system there was no such withdrawal privilege.

The entire controversy in this case is bottomed upon the action of the Board in changing the retirement age. It will be noted that these changes were both made after plaintiff had become eligible for retirement under Rule XIX-A, and before she was "dropped" on June 5, 1935.

Appellee thus states her contention:

"The plaintiff's last teaching contract was entered into on May 21, 1934. On and prior to that date there were just three things required to make a teacher *eligible* for Service Retirement, to wit: (1) 30 or more years of service (15 years being in Des Moines), (2) Attain the age of 55 years, and (3) Contribute to the Pension and Annuity Fund at least $200.00. The plaintiff had met all of these requirements prior to May 21st, 1934, and therefore prior also to April 16th, 1935, when the age requirement was changed to 65. Therefore her right to Service Retirement had fully matured and had become vested and fixed and could not be impaired or destroyed by subsequent ·action· of appellants."

In the conclusion of her argument, the appellee states:

"There is really just one question involved in this case and that is whether or not the plaintiff had a vested right. When that question is answered in the affirmative, the other points argued disappear."

Appellants state their answer to the appellee's contention in this language:

"A pension granted by a public authority is a gratuitous

allowance in which the pensioner has no vested right. The terms under which it is granted may be changed by such authority, and this is not altered by the fact that the pensioner has made compulsory contributions to the fund.''

Each side offers high authority in support of its position. The question has been before the courts of this country many times, and neither the decisions nor the reasons on which they are based are in harmony. The reason for much of this conflict is stated in Revised Volume 2, McQuillin Municipal Corporations, 2d Ed. 274, section 529, thus:

''It can well be understood that the origin of the sum from which the payments are made may determine the rights of the employee in many circumstances, and a great deal of the apparent conflict in the opinions disappears when considered in the light of such distinction. On the other hand, frequent failure of the courts to use any distinguishing terminology has * * * resulted in conflicting opinions.''

In earlier years, the common understanding of a ''pension'' was that it was a gratuity or bounty ''springing from the appreciation and graciousness of the sovereign,'' granted for services previously rendered and which at the time they were rendered gave rise to no legal obligation, the payment of which might be given or withheld at pleasure. Walton v. Cotton, 19 How. (60 U. S.) 355, 15 L. Ed. 658; United States v. Teller, 107 U. S. 64, 2 S. Ct. 39, 27 L. Ed. 352; People ex rel. Donovan v. Retirement Board, etc., 326 Ill. 579, 158 N. E. 220, 54 A. L. R. 940; State ex rel. Drage v. Jones, 37 Ohio App. 413, 174 N. E. 783; In re Opinion of the Justices, 88 N. H. 511, 192 A. 494 (the term may include a grant which was a mere gratuity); Sweesy v. Los Angeles County Peace Officers Ret. Board, 17 Cal. 2d 356, 110 P. 2d 37, 38; Lamb v. Board of County Peace Officers, 29 Cal. App. 2d 348, 350, 84 P. 2d 183; 48 C. J. 786; Bedford v. White, 106 Colo. 439, 106 P. 2d 469.

The annotator, in 54 A. L. R. 943, states the principle thus: ''The unquestioned rule is that a pension granted by the public authorities is not a contractual obligation, but a gratuitous allowance, in the continuance of which the pensioner has no vested right; and that a pension is accordingly terminable at the will

of the grantor.'' Many cases are cited in support of the statement. A large number of them go farther, and, in line with the appellants' contention, hold that even though contributions for the retirement fund be compulsorily exacted from the employees, any allowances which they may be entitled to therefrom, are nonetheless gratuitous pensions. These cases in support of their holding usually cite language in Pennie v. Reis, 132 U. S. 464, 10 S. Ct. 149, 33 L. Ed. 426, affirming 80 Cal. 266, 22 P. 176. In that case, assessments had been regularly deducted from a policeman's pay and placed in the retirement fund, from which on his death his widow would have received a lump sum of $1,000. He died on March 13, 1889, but payment of this sum was refused his representatives because nine days before his death this pension provision was amended. In holding that the enforced salary deductions created no vested or property right which could not be taken away by subsequent legislation, the United States Supreme Court said (33 L. Ed. 429) :

''* * * no money was contributed by the police officer out of his salary, but that the money which went into that fund * * * was money from the State [$2] retained in its possession for the creation of this very fund, the balance—one hundred dollars—being the only compensation paid to the police officer. Though called part of the officer's compensation, he never received it or controlled it, nor could he prevent its appropriation to the fund in question. He had no such power of disposition over it as always accompanies ownership of property.''

Substantially the same language has been used in other cases to support decisions that allowances from funds in part maintained by such contributions are gratuities. See State ex rel. Risch v. Board of Trustees of Policemen's Pension Fund, 121 Wis. 44, 98 N. W. 954; Raines v. Board of Trustees of Illinois State Teachers' Pension & Ret. Fund, 365 Ill. 610, 614, 7 N. E. 2d 489, 491; State ex rel. King v. Board of Trustees of Firemen's Pension Fund, 192 Mo. App. 583, 184 S. W. 929, 188 S. W. 239; MacLeod v. Fernandez, 1 Cir., P. R., 101 F. 2d 20; City of Dallas v. Trammell, 129 Tex. 150, 101 S. W. 2d 1009, 112 A. L. R. 997. In the Raines case, it is said ''that the money is not first segregated from the public fund so as to become

private property and then turned over to the pension fund, but is set aside or transferred from one public fund to another, and remains public money over which the person from whose salary it is deducted has no control, and in which he has no right." Such reasons for calling the retirement allowance a pension and a gratuity seem specious.

As stated by the New York Court of Appeals, Roddy v. Valentine, 268 N. Y. 228, 231, 197 N. E. 260, 261:

"The concept embodied in the word pension has developed far beyond the original idea of a bounty or gratuity, 'springing from the appreciation and graciousness of the sovereign,' granted in recognition of meritorious past services. One has but to examine the statutes of our own State * * * to appreciate the extent of the development. Necessarily there has come with that development changed theories relating to the nature of the rights and obligations under pension statutes both of civil servants and of the government. In an attempt at legal classification of the relation, the courts have come to widely varying results."

In Dismuke v. United States, 297 U. S. 167, 170, 56 S. Ct. 400, 402, 80 L. Ed. 561, 565, the United States Supreme Court, speaking through Justice Stone, held that such retirement allowances were not gratuities. The plaintiff sought recovery under the Civil Service Retirement Act in the district court, which the defendants contended had no jurisdiction because the recovery was for a "pension." The court said:

"The proviso withholding jurisdiction of suits on claims for pensions was a part of the original Tucker Act, which became law March 3, 1887, long before the enactment of the Retirement Act of May 22, 1920, and at a time when the term 'pensions' commonly referred to the gratuities paid by the government in recognition of past services in the Army or Navy. The annuities payable under the Retirement Act are not gratuities in that sense. The annuitant contributes to them by deductions from his salary or by actual payments into the fund, as in the present case, and the scheme of the Act is to provide for payment of annuities, in part at least from contributions

by employees, in recognition both of their past services and of services to be performed." '

In State ex rel. Gorczyca v. City of Minneapolis, 174 Minn. 594, 598, 219 N. W. 924, 925, the court said: "It is not a gratuity when the services are rendered while the pension or retirement relief statute is in force, so that the statute becomes a part of the contract of employment and contemplates such pension or allowance as part of the compensation for the services rendered." Other similar holdings are: Dryden v. Board of Pension Comrs., 6 Cal. 2d 575, 578, 59 P. 2d 104, 106, where 4 percent of the salary check had been deducted for 14 years. The court said: " 'A pension based upon such facts is not a gratuity. It is a periodical allowance of money granted by the city in consideration of services rendered or of loss or injury sustained, * * *.' " Brooks v. Pension Board, 30 Cal. App. 2d 118, 85 P. 2d 956; Adamson v. City of Little Rock, 199 Ark. 435, 134 S. W. 2d 558, 560, where the court said, after a similar quotation from 19 R. C. L. 726, section 33 in the chapter on Municipal Corporations: "The pension and benefits paid firemen and policemen is not a gratuity or a bounty, but is in the nature of increased or additional compensation." In State ex rel. Haberlan v. Love, 89 Neb. 149, 156, 131 N. W. 196, 199, 34 L. R. A., N. S., 607, Ann. Cas. 1912C, 542, the court stated: "* * * it may be conceded that the pension forms an inducement to the individual to enter and remain in the service of the fire department, and that the pension in a sense is part of the compensation paid for those services." See also Allen v. City of Omaha, 136 Neb. 620, 286 N. W. 916. Schieffelin v. Berry, 127 Misc. 178, 215 N. Y. S. 341, refers to such allowances as "deferred compensation." With reference to such legislation, Revised Volume 2, McQuillin Municipal Corporations, 2d Ed. 272, 273, section 529, says: "Laws so providing are sustained as valid and constitutional, [citing cases] on the ground that pensions are in the nature of compensation for services previously rendered and for which pay was withheld to induce long continued and faithful service." In Retirement Board of Allegheny County v. McGovern, 316 Pa. 161, 168, 169, 174 A. 400, 405, in which

Justice Kephart very ably discusses public employees' pensions, the court states:

"The distinction between pension and retirement pay is not artificial. The government and municipalities are interested in the faithful and effective discharge of duty by public servants, and a fund judiciously administered is an effective way to secure service of the highest type. * * * We said in Busser v. Snyder, 282 Pa. 440, 454 [128 A. 80, 85, 37 A. L. R. 1515], that the basis of retirement pay is neither charitable nor benevolent, but is the faithful, valuable service actually rendered over a long period of years. Retirement Acts, affecting many employees and officers, had been passed before the services were rendered, and the appropriations made, therefore, were for this 'delayed compensation for these years of [continued] service actually given in the performance of public duties in their respective capacities.'" The court also states on pages 170, 177, 178 of 316 Pa., page 405 of 174 A.: "Where an allowance is made out of hand, gratuitously, and purely for past services, by the government, it is a pension, with all the attributes of a pension; but where the employee contributes a part of his salary or wages with a sum from the State or county under a quasi contractual relationship with the municipality or State, creating a contributed reserve retirement system, the results are different, retirement pay made therefrom is not a pension; the contributions by the government, from their very nature, must be viewed in a different light. * * * The employee's contributions are as much wages or salary when deducted at the source as though they had been paid directly, * * *. But the funds the county or state contributes are absolutely vested in the system that has been created by it, except the right of withdrawal just discussed. To hold otherwise for the reason that employee contributions are not wages when compulsorily deducted would not only be unfair and unjust, but would circumvent all known equities. * * * To take an amount or to require an amount to be paid from a salary is a *de*duction of part of the salary and not a *re*duction of salary."

The Pennsylvania court has in no way departed from the principles stated in the McGovern case, supra, in its later decisions. See McBride v. Allegheny County Ret. Bd., 330 Pa. 402, 199 A. 130; Malone v. Hayden, 329 Pa. 213, 197 A. 344; Haldeman v. Hillegass, 335 Pa. 375, 6 A. 2d 801; Kelly v. Loveland, 141 Pa. Sup. Ct. 455, 15 A. 2d 411; Abrahams v. Wilson, 134 Pa. Sup. Ct. 297, 3 A. 2d 1016; Bausewine v. Philadelphia Police Pension Fund Assn., 337 Pa. 267, 10 A. 2d 446; Kane v. Policemen's Relief & Pension Fund of Pittsburgh, 336 Pa. 540, 9 A. 2d 739.

In Kieran v. Hunter College Retirement Board, 255 App. Div. 378, 379, 7 N. Y. S. 2d 612, 614, the court said:

"A retirement pension is in the nature of pay withheld to induce continued faithful service. It amounts to compensation for services previously rendered."

In Cobbs v. Home Ins. Co., 18 Ala. App. 206, 208, 91 So. 627, 629, the court after discussing with approval the right and purpose of the legislature in authorizing municipalities, with millions of dollars worth of property subject to fire hazards, to increase the efficiency of a department designed to protect life and property, by providing retirement and disability allowances to members of the fire department, to the end that the public may retain in this hazardous service men of the most faithful and efficient class, states:

"Reasons in support of this proposition are too obvious to be stated in detail. The compensation thus paid, by whatever name called, is not a gratuity, but a part of the stipulated consideration, for which they contracted and served." See also In re Opinion of the Justices, 88 N. H. 511, 192 A. 494.

The conclusion to be deduced from all of these decisions holding that allowances paid to public employees from retirement funds, in part maintained by them, is that such allowances are not pure pensions, gratuities, or bounties, but are given in consideration of services which were not fully recompensed when rendered. And also that any contribution by the state, or any subdivision of it, by way of taxation or other public money, to such retirement or disability funds, is not a donation

for a private purpose, but is a proper outlay for a public purpose, which purpose is to bring about a better and more efficient service in these various departments by improving their personnel and morale, through the retention of faithful and experienced employees.

But the fact that these retirement or disability payments are not gratuities, is not, in our judgment, sufficient to give to them the character of a property, or a vested, right, or a contract right, which cannot be adversely affected by subsequent legislation by either the state or a municipality. We believe we can reconcile this conclusion with those decisions which apparently support the contention of the appellee that she had a vested right to a pension for the full period from June 5, 1935 to December 20, 1938.

It is the holding of all of the Pennsylvania cases, which we have cited, that, when an employee who is a member of any retirement system, whether it affects policemen, firemen, school-teachers, or other public employees, has fully complied with all the requirements making him eligible to a retirement allowance, whether he chooses to ask for it then or later, he has a vested right to such allowance which cannot be adversely affected by subsequent legislation, except for a cause which we will refer to hereinafter. Until the employee has become eligible, as stated by these decisions, his right to the retirement allowance is inchoate, and it may be affected by subsequent legislation. Such is also the holding of Roddy v. Valentine, 286 N. Y. 228, 197 N. E. 260, supra; Kieran v. Hunter College Ret. Bd., 255 App. Div. 378, 7 N. Y. S. 2d 612, supra; Cox v. McElligott, 163 Misc. 619, 298 N. Y. S. 805. See also Hammitt v. Gaynor, 144 N. Y. S. 123.

Other decisions holding to this conclusion are State ex rel. Dudgeon v. Levitan, 181 Wis. 326, 193 N. W. 499, State ex rel. O'Neil v. Blied, 188 Wis. 442, 206 N. W. 213, and State ex rel. Stafford v. State Annuity & Investment Board, 219 Wis. 31, 261 N. W. 718. It may be noted, that, by statute in Wisconsin, the retirement provisions are made a part of every teacher's contract, which cannot be impaired by subsequent legislation. The California courts have uniformly held that the beneficiary has a vested right in the pension, retirement or disability allowance,

as soon as the contingency or event has happened which makes him eligible. Some of these decisions hold that the pension right is vested as a part of the contract of employment upon entering the service. Some also of these cases hold that under the wording of the retirement acts, the right is not vested in a certain sum, but such sum may be raised or decreased in correspondence with increases or decreases in the salaries of active officers of the same rank as the retired pensioners. See Kavanagh v. Board of Police Pension Fund Comrs., 134 Cal. 50, 66 P. 36; O'Dea v. Cook, 176 Cal. 659, 169 P. 366; Aitken v. Roche, 48 Cal. App. 753, 192 P. 464; Hermanson v. Board of Pension Comrs., (Cal.), 20 P. 2d 774, reversed on defense of statute of limitations, 219 Cal. 622, 28 P. 2d 21; Klench v. Board of Pen. Fund Comrs., 79 Cal. App. 171, 249 P. 46; Jones v. Cooney, 82 Cal. App. 265, 255 P. 536; Sheehan v. Board of Police Comrs., 47 Cal. App. 29, 190 P. 51; Casserly v. City of Oakland, 6 Cal. 2d 64, 56 P. 2d 237; Vero v. Sacramento City Employees' Ret. System, 41 Cal. App. 2d 482, 107 P. 2d 82; 20 Cal. Jur. 998; Dryden v. Board of Pension Comrs., 6 Cal. 2d 575, 59 P. 2d 104; Brooks v. Pension Board, 30 Cal. App. 2d 118, 85 P. 2d 956; Carr v. Fire Commission, 30 Cal. App. 2d 208, 85 P. 2d 959; Murphy v. City of Piedmont, 17 Cal. App. 2d 569, 62 P. 2d 614, 64 P. 2d 399. The Georgia court has held in support of the position of appellee. See Trotzier v. McElroy, 182 Ga. 719, 186 S. E. 817; West v. Trotzier, 185 Ga. 794, 196 S. E. 902; West v. Anderson, 187 Ga. 587, 1 S. E. 2d 671; Green v. West, 62 Ga. App. 584, 9 S. E. 2d 102; Hollis v. Jones, 184 Ga. 273, 191 S. E. 127. Such also is the holding in Crawford v. Teachers' Ret. Fund, 164 Or. 77, 99 P. 2d 729. See also Lynch v. United States, 292 U. S. 571, 54 S. Ct. 840, 78 L. Ed. 1434.

In addition to cases already cited herein which support the appellants' view that appellee had no vested right to a pension or annuity, we call attention to these additional authorities: Johnson v. State Employees' Ret. Assn., 208 Minn. 111, 292 N. W. 767; Hessian v. Ervin Employees' Ret. Assn., 204 Minn. 287, 283 N. W. 404; Voltz v. Goodwin, 6 Cir., Ohio, 57 F. 2d 31; Head v. Jacobs, 150 Ky. 290, 150 S. W. 349; Mell v. State ex rel. Fritz, 130 Ohio St. 306, 199 N. E. 72; Rohe v. City of Covington, 255 Ky. 164, 73 S. W. 2d 19; Miller v. Price, 282

Ky. 611, 139 S. W. 2d 450; Gibbs v. Minneapolis Fire Dept. Relief Assn., 125 Minn. 174, 145 N. W. 1075, Ann. Cas. 1915C, 749; People ex rel. Drea v. Hanson, 330 Ill. 79, 161 N. E. 145 (adverse legislation after retirement); Beutel v. Foreman, 288 Ill. 106, 123 N. E. 270 (adverse legislation after retirement); Griffith v. Rudolph, 298 F. 672, 54 App. D. C. 350; Rudolph v. United States ex rel. Stuart, 36 App. D. C. 379; Eddy v. Morgan, 216 Ill. 437, 75 N. E. 174; Kern v. State ex rel. Bess, 212 Ind. 611, 10 N. E. 2d 915, 54 A. L. R. 943; Salley v. Firemen's & Policemen's Pension Fund Com., 124 N. J. L. 79, 11 A. 2d 244; Bader v. Crone, 116 N. J. L. 329, 184 A. 346; Walter v. Police & Fire Pension Com., 120 N. J. L. 39, 198 A. 383.

Each side has cited statements in Iowa decisions lending some support to its respective view. What is stated therein was largely dicta, and not necessary to a decision, as none of the cases cited involved the issue in this case, that is, the affecting of one's rights under pension or retirement legislation by changes therein after the alleged vesting of those rights. In Gaffney v. Young, 200 Iowa 1030, 205 N. W. 865, the widow of a policeman, who died January 18, 1912, failed to apply for her pension until September 10, 1924. Her application was denied October 20, 1924, and she proceeded by certiorari to test the legality of this ruling. The writ was granted and respondents appealed. There was no question that the widow was entitled to the pension on the death of her husband, and this right was in no way affected by any change in the pension legislation. The question involved in the appeal was whether her right was barred by laches or the statute of limitation. The court held it was not. While the court discusses generally the matter of pensions, it said:

"We are not concerned with any right or power of the legislature to affect by subsequent legislation the amount or terms of an existing pension." (Page 1033 of 200 Iowa, page 867 of 205 N. W.)

In Lage v. City of Marshalltown, 212 Iowa 53, 235 N. W. 761, and its companion case, Campbell v. City of Marshalltown, (Iowa), 235 N. W. 764, the action was one at law against the city for judgment because of the failure of the city council to

levy the statutory tax to help maintain the pension fund for firemen and policemen. Whatever rights the plaintiff had, had been in no way changed by any subsequent legislation. The pension law was still in full force and effect, and while that status existed, plaintiff's rights were vested to the extent that she was entitled to have the law enforced. Stevens v. Minneapolis Fire Dept. Rel. Assn., 124 Minn. 381, 145 N. W. 35, 50 L. R. A., N. S., 1018; Passaic Nat. Bank v. Eelman, 116 N. J. L. 279, 183 A. 677; State ex rel. Haberlan v. Love, 89 Neb. 149, 131 N. W. 196, 34 L. R. A., N. S., 607, Ann. Cas. 1912C, 542. Again the court discusses the general rights of such pensioners, but the question in the case was one of procedure. The court held that the proceeding should have been by mandamus to compel the levying of the tax.

In Dickey v. Jackson, 181 Iowa 1155, 165 N. W. 387, plaintiff had been properly placed on the policemen's pension roll for disabilities received. Later he was awarded workmen's compensation against the city for the same disability. For that reason the defendant trustees ordered him removed from the pension rolls. They did so without complying with the statutory provisions requiring notice to the pensioner of the hearing. A writ of certiorari was sustained because of this failure. The question of his right to the award because of any change in the pension act was not involved, but in speaking of a pension the court said: "The latter is ordinarily a gratuity from the government, or some of its subordinate agencies, in recognition of but not as payment for past services; though, when provided as part of a scheme of employment, it would seem to include some elements of a contractual character, and is doubtless intended to encourage faithfulness of service." (Page 1160 of 181 Iowa, page 389 of 165 N. W.) These cases give little, if any, aid to either side. A case is authority only for what it actually decides.

It is our judgment that under sound principles of law, and under the particular facts of this case, that notwithstanding the appellee was eligible for retirement prior to the resolution of the defending board, on April 16, 1935, raising the retirement age to 65 years, her pension rights were not absolutely vested, but were subject to the amending resolution. She was

not then 65 years old. On March 6, 1936, the Board reduced the retirement age to 60 years, and she reached that age on May 29, 1936.

It is a well-established rule of law that, ordinarily, in matters of government, or public policy, or in the exercise of the police power, one legislature cannot by its legislation bind the hands of a future legislature respecting the same subject matter. The establishment and the maintenance of an educational system through public schools is an indispensable obligation and function of the state of Iowa. It should be so maintained as to keep abreast with progress generally, and to meet the needs of the times. This applies not only to the courses of study but also to the teaching force. The policy with respect to either should not be an inflexible one. The matter is ably discussed in Malone v. Hayden (and seven other Teachers' Tenure Act cases), 329 Pa. 213, 223 et seq., 197 A. 344, 352 et seq. After stating that the Constitution of Pennsylvania recognizes the cause of education as a distinct obligation of the state, the opinion continues:

''The power of the state over education thus falls into that class of powers which are made fundamental to our government. * * * The power over education is an attribute of government that cannot be legislatively extinguished. It cannot be bargained away or fettered. * * * So implanted is this section of the Constitution in the life of the people as to make it impossible for a Legislature to set up an educational policy which future Legislatures cannot change. The very essence of this section is to enable successive Legislatures to adopt a changing program to keep abreast of educational advances. * * * Even if no mention were made in these contracts [teachers' contracts] of the reserved power in the Legislature to alter the school laws, it would be deemed to exist by essential implication. * * * This principle is similar to that applied to other contracts affected with a public interest, which are considered to be made in contemplation of the police power of the state to protect the health, morals, and safety of its citizens. * * * But the contract which the school teachers have with the state is a qualified contract. It is subject to delimitation of its operation

by subsequent statutory changes. When a state enters into contracts with private individuals for the performance of services as independent contractors, or for the loan of funds incidental to the carrying out of a governmental function, these contracts are protected against impairment by subsequent legislation. * * * These, to a degree, partake of the nature of business or proprietary contracts. For example, municipal governments, acting in their governmental capacity, provide police and firemen to protect the safety and property of their citizens. The employment of these men is in the direct exercise of the governmental function and the employees are within the immediate path of its operation. In performing their services they represent the government and exercise a portion of its powers. But when a municipality contracts for the erection of a fire house or police station, the contractor is doing something which is merely auxiliary to the exercise of a governmental function. He neither represents the municipality, nor exercises municipal power. The contract which the municipality makes with the building contractor cannot be abrogated either by the municipality or the Legislature. The policemen and firemen, on the other hand, are not in a position to object to a change of their status by subsequent enactments. All rights which such employees may possess flow from the government * * * and are taken subject to its future exercise."

In Campbell v. Aldrich, 159 Or. 208, 217, 79 P. 2d 257, 261, the plaintiffs (teachers) challenged the validity of certain sections of the "teachers' tenure law." The court said:

"Assuming, but not deciding, that plaintiffs acquired vested contractual rights under the 1913 tenure law, we think such private rights must yield to the public welfare when a different educational policy has been determined through the proper exercise of the police power. * * * It is unquestionably the function of government to establish and maintain public schools. * * * That public education and the control thereof is a proper subject for the exercise of the police power is beyond question. It is difficult to conceive of any legislative policy which more vitally affects the public welfare."

Phelps v. State Board of Education, 115 N. J. L. 310, 313, 180 A. 220, 222, was a proceeding in certiorari challenging proceedings of the defendant in *reducing teachers' salaries in accordance with an economic emergency act of 1933.* Judgment for the defendants was affirmed. The court said:

"The act of 1909, relating to tenure, provides, among other things, that no teacher shall be dismissed or subjected to reduction of salary except for certain causes after charges and a trial. That established a legislative status for teachers, but we fail to see that it established a contractual one that the Legislature may not modify. * * * The status of tenure teachers, while in one sense perhaps contractual, is in essence dependent on a statute, like that of the incumbent of a statutory office, which the Legislature at will may abolish, or whose emoluments it may change."

The judgment in the above case was affirmed by the United States Supreme Court, 300 U. S. 319, 57 S. Ct. 483, 81 L. Ed. 674. Other cases fully supporting the principle of these cases are Groves v. Board of Ed. of Chicago, 367 Ill. 91, 10 N. E. 2d 403; State ex rel. Dudgeon v. Levitan, 181 Wis. 326, 193 N. W. 499; State ex rel. O'Neil v. Blied, 188 Wis. 442, 206 N. W. 213; Sloan v. School Directors, 373 Ill. 511, 26 N. E. 2d 846; 6 R. C. L. 339; Johnson v. State Employees' Ret. Assn., 208 Minn. 111, 292 N. W. 767; Williams v. City of New Bedford, 303 Mass. 213, 21 N. E. 2d 265.

In the case before us, the appellee had a teacher's contract during all of the time she taught. The last contract, and many before it, contained the following provisions:

"This District having adopted a pension and retirement system in accordance with the laws of the State of Iowa, it is agreed that one per cent of the salary due for services under this contract, * * * shall be paid into the Teachers' Retirement Fund. * * * It is also agreed that this contract is subject to all the rules and regulations adopted by the Board of Directors * * *."

This is not a contract for the payment of a pension, but

as stated in the Phelps case, supra, "is in essence dependent on a statute," and the right of the Board to modify it.

When the legislature passed this enabling act, and the Board adopted Rule XIX-A, it was the intention of both bodies that the retirement system should be actuarially sound. It was thought that the sources provided would build up a reserve fund sufficient to pay the retirement and disability allowances. If the reserve fund should be insufficient to do this there was no other source from which the allowances could be paid. As said in Johnson v. State Employees' Ret. Assn., supra, 208 Minn. 111, 292 N. W. 767, 769: "However, in the statutes at the time this plaintiff retired no right was given him to recover the monthly annuity as it accrued *from anyone or anything except the retirement fund.*" (Italics ours.) The insolvency of the reserve fund under the Minnesota State Employees Retirement Association was shown in Hessian v. Ervin, 204 Minn. 287, 283 N. W. 404, and prior to the Johnson case the state had attempted to strengthen it by an appropriation of $50,000.

In Bader v. Crone, supra, 116 N. J. L. 329, 332, 184 A. 346, 347, the court said:

"Obviously the intention of the legislature is to preserve a solvent fund against the happening of the pivotal event, retirement in the one case and death in the other, upon which the right to a pension depends. The reliance of Bader, and of his wife if she survived him, is upon the adequacy of the fund to meet its obligations."

In that case, the deductions from the pension of the husband after his retirement were increased to protect the allowance to his widow after his death. The court held it was proper.

The courts of Pennsylvania, California and Georgia, which are the strongest supporters of the appellee's contention, recognize that actuarial or administrative changes if reasonable and necessary to strengthen the financial soundness and security of such retirement systems are matters within the legislative control and discretion, and afford no legal basis for complaint upon the part of the beneficiaries. In the McGovern case, supra [316 Pa., on pages 174, 175], 174 A., commencing on page 407, the Pennsylvania court, after referring to the claim that re-

tiring employees were to contribute to a fund, the insolvency of which would increase and would ultimately consume these contributions, said:

"It is no doubt true that if the retirement funds are insolvent or will become insolvent because of actuarial unsoundness, or if the contributions by the employees, or the results expected, are prejudiced by retirement payments, and the employees' property will or may be consumed, so that there will be no funds with which to make retirement payments, a very serious question arises; to answer it the controlling principles should be clearly set forth.

"The charge of insolvency, when dependent on actuarial matters, presents a factual situation which may be controlled by the Legislature. * * *

"But underlying all retirement systems of the class we are now discussing is the legislative object, as well as that of the member employee, that a substantial reserve be built up so that the actuarial soundness of the plan cannot be questioned. This factor is an important one in the relation between state, city, and county, as employer, and the employee member, with respect to retirement pay. If a direct attack on it, such as has been made in the present case, is justified, or a weakness in it manifested through actual trial is found to exist, the remedy or relief rests clearly within the relation between employer and employee contemplated by the legislative system for retirement pay. The Legislature may from time to time, within the confines of that established relation, alter, change, amend, and render intact the actuarial soundness of the system so as to strengthen its fibers in any way it sees fit. Changes in details, such as length of service required, contributions needed, and age requirements, to keep the fund on sound actuarial practices, are essential. Flexibility in component parts is a paramount necessity to guard against changed conditions and to permit keeping abreast with actuarial science."

The California courts have, in a number of cases, lowered or raised the allowances after retirement to meet changing conditions. In Casserly v. City of Oakland, supra, 6 Cal. 2d 64, 56 P. 2d 237, the allowance to a pensioner was lowered when the

salaries of those of the same rank in active service were lowered because of economic emergency. In Hollis v. Jones, 187 Ga. 14, 19, 199 S. E. 203, 205, the widow's award had been reduced from $99 to $40 a month by amendment to the law, brought about by actuarial weakness. She sued for the deficit. In denying her claim, the court said:

" * * * she is entitled to only such sum as might be lawfully paid to her under the act of 1925. The trustees were required to administer only such funds as came into their hands under this statute, and will not be compelled by the writ of mandamus to perform the impossible."

The Board, in the present case, adopted the plan of raising the retirement age to strengthen the reserve fund. Some method of fortifying the financial security of the system was necessary. We are clearly of the opinion that no rights of the appellee have been invaded. The trial court was in error in granting her a pension from June 5, 1935 to May 29, 1936.

On the last date, however, she had met every requirement under the provisions of the plan, as amended by the resolution of March 6, 1936, to make her eligible to a service retirement allowance. She was then 60 years old, the retirement age fixed by the amendment of that date. She had been effectively retired by the defendants when she was "dropped" from the teaching roster and was told that she was through teaching in the defendant school district. It is true that the defendants did not know she had reached a retirement age because of the error in the school records. But when the Board approved the application of the superintendent for her retirement with pension on December 20, 1938, it knew that she had in fact been eligible for retirement on and since May 29, 1936. It is our conclusion that she is entitled to recover judgment for monthly retirement allowances of $40 a month, with lawful interest, for the period from May 29, 1936 to December 20, 1938.

Appellants urge that appellee had estopped herself by falsely stating her age on the personnel card. Also that the Board by granting her a retirement allowance on and from December 20, 1938, impliedly denied her right to a pension for any prior period, and that certiorari was not brought within a

973

year from this adverse holding. We find no error on either of these assignments.

The judgment is modified and affirmed as herein set out, and the trial court is directed to enter judgment for appellee in conformity herewith, for retirement allowance due her, for the period commencing on May 29, 1936 and ending December 20, 1938, computed at $40 a month, together with lawful interest.— Modified and affirmed.

STIGER, SAGER, GARFIELD, HALE, and WENNERSTRUM, JJ., concur.

MILLER, C. J., and MITCHELL and OLIVER, JJ., concur in the result.