Clyde R. Gates, appellant, v. City Council of Bloomfield, appellee.

No. 47893.

(Reported in 50 N.W.2d 578)

2

DECEMBER 13, 1951.

D. W. Harris and W. R. Fimmen, both of Bloomfield, for appellant.

Buell McCash, of Bloomfield, and Wilbur R. Dull, of Ottumwa, for appellee.

MULRONEY, J.—Plaintiff brought certiorari action against the City Council of Bloomfield to test the validity of Ordinance 136. Plaintiff alleged he was the owner of a business building in Bloomfield and the ordinance adopted by the city council made a bus zone for large buses in the street fronting his property where the buses could load and unload passengers, baggage and

freight. He alleges damages in that his property was thereby rendered less desirable as business property and his right of ingress and egress to his property was substantially abridged. The petition alleges respondents, members of the council, acted in excess of their jurisdiction and illegally, arbitrarily and unreasonably in adopting the ordinance and that the same constitutes a taking of his property without compensation and that the establishment of the bus zone in front of his premises was "for the sole purpose and benefit of promoting the business of the adjoining owner to the south"—a bus station.

The city council appeared and filed answer in response to the preliminary writ and, after hearing testimony, the trial court quashed the writ and plaintiff appeals.

Ordinance 136 is entitled: "An Ordinance Establishing Bus-Stop Zone; Prohibiting Parking of Vehicles therein; and Providing Penalties for Violation thereof." In the first section it describes the area which is "established and designated as a bus-stop zone and loading area." Plaintiff's lot and building on the east side of Washington Street has forty-three feet frontage on that street and the bus station, immediately south of plaintiff's building has twelve feet frontage on Washington Street. The area described in the ordinance is a strip ten feet wide, outside the curb and fifty-three feet long, which includes all of plaintiff's frontage and ten feet of the bus station's frontage—the south two feet of the bus station's frontage is in the curve of a filling station driveway immediately south of the bus station.

Sections 2 and 3 of the ordinance provide as follows:

"It shall be unlawful for the operator of any vehicle, except operators of common-carrier buses engaged in interstate and/or intrastate business, to park such vehicle in said bus-stop zone and loading area, except in order to take on or discharge passengers or freight, and then only for such length of time as is necessary for such purposes.

"That the north and south limits of said bus-stop zone and loading area shall be marked by signs bearing the inscription 'No Parking—Bus-Stop.'"

The remaining sections provide for fine or imprisonment for violators, the repeal of ordinances in conflict, and publication.

It appears to be conceded that the formal requisites for due adoption of the ordinance were observed.

Section 2 is not very, clear and there is a controversy in the briefs as to whether the ordinance permitted any motor vehicle to stop in the zone to load or unload passengers and freight or whether it prohibits the stopping of all vehicles within the area except buses. The trial court in his findings and conclusions stated that "counsel agree in argument and the pleadings filed by both sides agree" that the ordinance permitted any vehicle to stop in the zone to load or unload passengers or freight. Plaintiff's petition makes no such concession and he states here he made no such concession in the argument in the trial court. However, we need not decide this controversy. We will accept the meaning urged by respondents that it permitted any vehicle to stop in the zone to load or unload passengers or freight. Such a conceded meaning would be of small value to plaintiff and most of the traveling public but of great value to the interurban bus lines. Plaintiff and his tenants would have but few occasions to stop in front of plaintiff's property "to take on or discharge passengers and/or freight." Relatively few of the traveling public, other than the interurban buses, would have occasion to stop for the same purpose. Since the only reason a bus would stop would be "to take on or discharge passengers and/or freight" and, under any interpretation, no one could enter the zone for any other purpose, it is abundantly clear that the ordinance was designed to give and did give the bus companies exclusive or almost exclusive rights to stop their buses on the street in front of plaintiff's property to load and unload passengers and freight. The Missouri Transit makes six and the Arrow Coach seven regular scheduled stops in the area each day, and sometimes a Greyhound bus stops. The buses stopped at no other place in Bloomfield. The ordinance was passed within a few days after the bus station was moved to the location just south of plaintiff's property. Shortly after the ordinance was passed the city tore up a strip of old cement covering a part of what might be called the parking lying between the sidewalk in front of plaintiff's property and the paved highway and covered the entire parking, about twelve feet in width, with concrete with the west edge of this concrete flush with the pavement. One of the councilmen said they put

in the concrete on the old parking because "we wanted it to be safe for walking out to the bus." Another said: "This concrete slab that we put in there was put there with the intention of being for the buses." The mayor said the parking was paved "for the purpose of providing a bus stop there, a bus stop and unloading job * * * it was done to prevent injury to passengers who might be getting on and off the buses."

The record warrants the trial court's conclusion that the bus company's use of the zone damaged plaintiff. At the time the ordinance was passed there was a restaurant, hotel lobby (twelve sleeping rooms on the second floor) and a barbershop in plaintiff's building, with main entrances from the sidewalk on Washington Street. A taxi operator had his office in the hotel lobby. The trial court, in his written findings of fact, found:

"The Missouri Transit Company regularly stops six buses there daily, and the Arrow Coach Company seven. They park at an angle, using the entire twenty-two foot strip, and occasionally they also overhang the sidewalk with the corner of the bus and open door. Some of these buses are eight feet four inches wide, more than thirty feet long, and carry from thirty to thirty-five passengers when fully loaded. Though scheduled to arrive and depart at the same instant, they park there from a few minutes to an hour. On the first day of this trial there were three buses there at the same time for some period, one of them for forty minutes. They frequently obstruct the public alley [north of plaintiff's lot], there not being room for three of them in the 'bus zone,' nor even for two. The buses emit noxious gases into plaintiff's building which are injurious to health and offensive to the sense of smell, and at times it has necessitated the closing of the doors in plaintiff's building. Passengers in varying numbers congregate in front of plaintiff's premises, on the walk, and set their baggage thereon, to such an extent that ready access to the building is obstructed and entrance rendered difficult. The buses when loaded can be unloaded and reloaded in five minutes or less.

"As a result of such conditions patronage of the hotel naturally fell off half, the lessee surrendered her lease and quit business, and the taxi operator left, and plaintiff has been unable

to again rent the premises. The barbershop remained, but has been substantially injured by the noxious gas, obstruction to his entrance, and lack of parking space."

It is enough to say there is substantial evidence to support the above finding. Talbott v. Independent Sch. Dist., 230 Iowa 949, 299 N.W. 556, 137 A. L. R. 234.

The trial court also specifically found that the bus companies "have been maintaining a nuisance in front of plaintiff's premises in violation of his rights as an abutter and in violation of the general statutes prohibiting the maintenance of nuisances in the streets and plaintiff has been grievously damaged thereby." But the trial court seemed to find most of plaintiff's damage was caused by the violation of the ordinance in that the buses would often remain in the zone, with the city's tacit permission, much longer (an hour or two) than was necessary to discharge or take on passengers and freight. However, Mrs. Beggs, the operator of the bus station, testified that these bus lines were connecting carriers and if one was late the other had to wait at the station until it arrived. She said: "That is the law; that is an I. C. C. (Interstate Commerce Commission) regulation; that is a thing that has to be done. It don't make any difference whether it is fifteen minutes or an hour, they have to wait." Since it is clear the zone was created for the use of these bus companies, it would seem they would have a good argument that the waiting stops for arrival of a connecting bus would be stops "for such length of time as is necessary to take on or discharge passengers or freight."

There is one other dispute which the trial court states was settled by agreement of counsel. There is a seven-foot sidewalk in front of plaintiff's building and the bus depot to the south. There never was a curb between this sidewalk and the twelve-foot parking, at least not for many years. Also there never was a curb between the parking and the paved highway. The ordinance describes the zone as a ten-foot strip on "the paved portion of Washington Street" extending "along the east curb of Washington Street." The trial court stated that the parties seemed to agree the ordinance meant a ten-foot strip in the traveled portion of the highway, west of the twelve-foot parking. Counsel for plaintiff denies such an agreement and argues the twelve-foot parking which the city councilmen stated they covered with

8

concrete "for the buses" was within the zone. The evidence shows the city painted a yellow line ten feet out into the traveled portion of the highway west of the parking, but it also placed "No Parking—Bus Stop" signs at each end of the twelve-foot paved parking. The matter is not of much importance save as it explains some of the other rulings of the trial court. He found there was nothing to prevent "plaintiff, his tenants, customers or guests" from parking indefinitely on the twelve-foot paved parking. Presumably they could park there if the buses had not pre-empted the space, but in any event such a parking area, with a bus zone on the street side, would be of little value.

Ī. A realistic view of the whole record is that the city council by Ordinance 136 gave the bus companies a portion of the city street abutting plaintiff's property to use as a passenger platform and freight loading dock. By giving the bus companies a ten-foot strip on the paved travel portion of the highway the council successfully gave them also the adjacent twelve-foot parking which was paved for the bus companies' use. It was not intended that anyone but the bus companies would use the paved parking and no one could make much use of it save a bus with privilege to occupy the outer ten-foot strip.

II. The respondents seek to uphold the ordinance as a legislative action of the city council in the exercise of the city's police powers. The argument is based on a first premise that the ordinance is a traffic regulation and within a city's general and statutory powers of supervision and control of city streets. Appellee cites many cases involving the reasonableness of traffic regulations, and the parking meter cases, and taxi and hack stand cases. The argument is wrong in its first premise. The question here under the whole record is whether the city had power to turn over to a bus station, with twelve feet of frontage, the entire forty-three feet of the street in front of plaintiff's adjoining property to be used by the interurban motor buses stopping at the station for loading and unloading passengers, baggage and freight. As plaintiff states, this is the only question in the case. Even in the taxi-stand cases, where cities are given express statutory authority to establish zones for such stands, it is usually held such a taxi stand cannot be established in front of property without the abutting property owner's consent or if the consent

is not required they must be so located "as not to cause intolerable annoyance and inconvenience to abutting owners." 60 C. J. S., Motor Vehicles, section 50; In re Opinion of the Justices, 300 Mass. 602, 14 N.E.2d 462. See also Ritchhart v. Barton, 193 Iowa 271, 186 N.W. 851. There is no use discussing the taxi-stand or parking-meter cases because the city is given express statutory authority to establish zones for both. Here there is no statutory authority empowering cities to establish zones for the use of interurban motor buses for a depot. The only power given to cities by statute over such buses is "to designate the streets or routes over which motor carriers shall travel." Section 325.27, Code, 1950. Respondents cite section 389.39, paragraph 3, Code, 1950, investing the city with power "to establish stands for * * * omnibuses", but build no argument on the statute. The statute obviously applies to buses engaged in carrying passengers on a plan similar to street railways.

With no express power granted to a city to turn over a por- -tion of the street to interurban bus lines to use as a depot the ordinance can only be sustained on the ground the power is implied. Van Eaton v. Town of Sidney, 211 Iowa 986, 231 N.W. 475, 71 A. L. R. 820.

III. Defendant argues the plaintiff is not entitled to relief in certiorari for in passing the ordinance the city was acting in a legislative capacity and rule 306 provides: "A writ of certiorari shall only be granted * * * where an inferior tribunal, board or officer, exercising judicial functions, is alleged to have exceeded its or his proper jurisdiction or otherwise acted illegally."

But defendant's argument starts with the statement that the ordinance was passed pursuant to a city's delegated police powers regulating the standing or parking of vehicles. See section 321.236(1), Code, 1950. The argument begs the question, for our examination of the ordinance is to see if it be within the sphere of a city's implied power to regulate its streets. Plaintiff's entire case is that the ordinance was a grant of use of the street to the bus companies, to carry on their business. We hold it was such a grant and as such the action of the city council was judicial. 62 C. J. S., Municipal Corporations, section 112.

The nature of the act performed determines whether or

not it was legislative or judicial. The council undertook to determine law when it decided it had the power to grant to the bus companies the privilege of using city streets to carry on their private businesses. The fact that its grant took the form of an ordinance excluding all, or almost all, from the bus-zone area except the buses is of no importance.

The case is much like Lerch v. Short, 192 Iowa 576, 577, 579, 185 N.W. 129, 130, where the city, by ordinance, vacated an alley between two streets so that it could sell the alley to the abutting property owners for $20,000. We held the validity of the ordinance could be tested in certiorari against the council; that "the council may not dispose of them [city streets and alleys] * * * to subserve the private interests of individuals * * * that its action with respect thereto was properly annulled by the lower court on the writ of certiorari."

 IV. Respondents argue, in effect, that the proceedings of the city council were not in dispute and all other evidence in the case cannot be considered. They say the test of the validity of the ordinance is what it provides, not what was done under it or the motives of the councilmen in passing it. Rule 315, Rules of Civil Procedure, provides the trial court in a certiorari action may receive "oral or written evidence as is explanatory of the matters contained in the return [and] such transcript and additional evidence shall be considered for the sole purpose of determining the legality of the proceedings * * *." The "legality of the proceedings" or the ordinance would be upheld unless it was a grant of use of the street to bus companies to carry on their passenger and freight depot business. Any evidence tending to show it actually was such a grant of use was properly received, since it would tend to show the action was illegal and in excess of the council's jurisdiction. Kruse v. Vail, 238 Iowa 1277, 30 N.W.2d 159; Lerch v. Short, 192 Iowa 576, 185 N.W. 129.

 V. We have said "that the motives of a city council, in passing an ordinance, * * * as a general rule, cannot be inquired into by the courts." Huston v. City of Des Moines, 176 Iowa 455 at 477, 156 N.W. 883, 892. But there is authority that this general rule is subject to some qualifications and in any event "the rule is limited to purely legislative acts."

62 C. J. S., Municipal Corporations, section 200. We hold the act here was judicial so the rule has no application. The motives of the councilmen, the purpose they had in view, can be considered. Ordinarily it would be presumed that the councilmen's purpose was to accomplish that which followed as the reasonable effect of the ordinance they adopted. Here, there is added testimony by the mayor and councilmen that they intended to turn over the street in front of plaintiff's property for use by the bus companies for a bus-station platform for their passengers and freight and abundant testimony that the ordinance accomplished the purpose.

Somewhat the same contention was made in Lerch v. Short, supra, where the city ordinance vacating the alley was adopted and the mayor and two councilmen were allowed to testify that their motive was to sell the alley to the abutting property owners and they never would have voted for the ordinance of vacation except for the plan to sell. Often the motive, considered really as the purpose in view, is of prime importance in determining whether the act was arbitrary or illegal. In the Lerch case a simple ordinance for vacating an alley was, after the councilmen's testimony, a plan to sell an alley, which the city held in trust for the public, "to subserve the private interests of individuals." Here it is just as clear that an ordinance, regulatory in form, to create a zone where if you will all vehicles can stop, load and unload passengers and freight, is really, according to what was intended and accomplished, a grant to the bus companies to use a part of the street as a passenger and freight depot. The councilmen make this abundantly clear by their statements and by their act of paving the parking for use by the buses out of general tax funds.

VI. Our holding that the ordinance was a grant of privilege to the bus companies to devote a portion of the street in front of plaintiff's property for business use is decisive of the whole case. We need not decide what the effect would be if a city were empowered by statute to grant such a right. Under all authorities a city has no implied right to grant to individuals the right to use the streets for business purposes. We find no case exactly like this, but the governing principles are the same as in the many cases involving the placing of obstructions in the street

to subserve a private business. As said in Lacy v. City of Oskaloosa, 143 Iowa 704, 709, 121 N.W. 542, 544, 31 L. R. A., N. S., 853:

"A 'street' is a public way from side to side and from end to end, and any private use thereof which * * * detracts from, hinders, or prevents its free use as a public way to its full extent is within the meaning of the law an obstruction or incumbrance."

In Pugh v. City of Des Moines, 176 Iowa 593, 606, 156 N.W. 892, 896, L. R. A. 1917F 345, we stated: "The authorities seem uniform in holding that a person cannot carry on his business in a public street in such a way as to obstruct the street, either by placing actual physical obstructions upon it, or even in such a way as to collect crowds upon the walk, or in front of his business, or so as to interfere with the public travel."

The case is really ruled by Cowin v. City of Waterloo, 237 Iowa 202, 21 N.W.2d 705, 163 A. L. R. 1327. There we held the city had no authority to grant a license to operate a newsstand on a sidewalk. The principle announced in the Cowin case and the many authorities cited therein are equally applicable here. When speaking of a street as a place for public travel the term includes both the roadway for vehicles and the sidewalk for pedestrians. Gallaher v. City of Jefferson, 125 Iowa 324, 101 N.W. 124. All of the cases involving the right of a city to grant permission for private use of a street make no distinction between whether the area granted was sidewalk or roadway.

In Wright v. Wabash R. Co., 174 Mo. App. 446, 453, 160 S.W. 549, 552, a city was empowered by statute to grant permission to allow a railroad to lay its track on a street. The city granted the railroad permission to lay what was called a "house track" and an abutting property owner sued the railroad for damages. In the opinion the court held:

"A house track whereon cars are loaded and unloaded by the patrons of the company is but an adjunct of the freight depot, a part of the company's establishment for the transaction of business with the community, an open warehouse and loading place, and the maintenance of such a track in a public street cannot be regarded as a use of the street for the purposes of travel. * * * These considerations compel the conclusion that the

attempted grant by the city of authority to lay and maintain a house track in the street was void for the reasons that the grant contemplated an unreasonable appropriation of the street, and further contemplated the use of the street for an improper purpose."

In Pennsylvania R. Co. v. Angel, 41 N. J. Eq. 316, 328, 7 A. 432, 433, another railroad case, it is stated: "* * * the use of the Avenue [is] for the purpose of a way, not for the purpose of a station yard."

In Sundstrom v. Village of Oak Park, 374 Ill. 632, 637, 30 N.E.2d 58, 62, 131 A. L. R. 1465, 1470, it is stated: "While a station building and grounds facilitate the business of a railroad, such a use of the street necessarily excludes other modes of travel on that portion of the street. The municipality had no power to authorize or permit such occupancy."

Some other cases holding a city cannot grant a railroad the right to use the street for a switch track are: Knapp, Stout & Co. v. St. Louis Transfer Ry. Co., 126 Mo. 26, 28 S.W. 627; Sherlock v. Kansas City Belt Ry. Co., 142 Mo. 172, 43 S.W. 629, 64 Am. St. Rep. 551; Patton v. Olympia Door & Lumber Co., 15 Wash. 210, 46 P. 237; Pennsylvania Co. v. Bond, 202 Ill. 95, 66 N.E. 941. See also Hamilton Lbr. & Mfg. Co. v. City of Paterson, 121 N. J. L. 95, 1 A.2d 311, holding invalid a city ordinance which granted a business the right to operate a private railroad siding on a public street, and Harbuck v. Richland Box Co., 204 Ga. 352, 49 S.E.2d 883, holding invalid a city ordinance which gave street space, alongside a track, to a business to be used for loading and unloading freight.

The development of the common-carrier interurban bus, handling passenger and freight traffic once carried by railroads, has not changed basic principles concerning the rights of owners of property abutting streets. Such owners must submit to the inconvenience occasioned necessarily by bus travel over the highways, but that is because the highways are for the use of the traveling public. Whether abutting property owners can be made to submit to all the added inconvenience and damages arising from the location of interurban bus stations in front of their property, by a state statute, we need not decide. It is enough for the purpose of this case to say that a city is without implied power to grant an interurban bus company the right to use the

street fronting another's property for a place to stop to load and unload passengers, baggage and freight.

Under legislative investment of general regulatory power a city can regulate the public use of highways within the limits of public rights. That is what we held in Cowin v. Waterloo, supra. Under the record in this case the city has by Ordinance 136 succeeded in turning over a portion of Washington Street—and we need not determine the exact area—in front of plaintiff's property to the interurban motorbuses for use in their business. The ordinance even mentions "common-carrier buses engaged in interstate and/or intrastate business." But without such mention the plain implication is present by the passage of the ordinance establishing a "Bus-Stop Zone" within a few days after the location of the bus station, where thirteen regularly scheduled interurban buses were to stop each day, and the councilmen's testimony that they paved the parking in front of plaintiff's property for the use of the buses. We hold the ordinance illegal and in excess of the council's proper jurisdiction. Plaintiff has suffered private damage by this grant of private use and he can therefore maintain the action for the writ. The writ should be sustained.

Respondents' motion to dismiss the appeal as moot because Ordinance 136 has, while the appeal was pending here, been repealed and Ordinance 143 adopted in lieu thereof is overruled. Respondents argued at the time of the submission of this case, and it is apparent from a reading of the two ordinances, that Ordinance 143 merely re-enacts in plainer language that which respondents contend was the proper interpretation of Ordinance 136. Throughout our discussion we have adopted respondents' interpretation of Ordinance 136, which means Ordinance 143 is just as illegal. Graff v. City of Tacoma, 61 Wash. 186, 112 P. 250. The controversy did not cease to exist by the passage of the new clarifying ordinance and the repeal of the old. The case was not rendered moot. 4 C. J. S., Appeal and Error, section 1354; Cramer v. Phoenix Mut. L. Ins. Co. of Hartford, 8 Cir., Iowa, 91 F.2d 141.

The cause is reversed for judgment sustaining the writ.— Reversed.

All JUSTICES concur.